Filed 2/1/22  In re C.B. CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re C.B., Jr., a Person Coming Under the Juvenile Court Law. | B312379 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>C.B.,<br><br>        Defendant and Appellant. | (Los Angeles County Super. Ct. No. 21CCJP00599A) |

APPEAL from an order of the Superior Court of Los Angeles County, Lisa A. Brackelmanns, Judge Pro Tempore. Affirmed.

Paul Couenhoven, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Veronica Randazzo, Deputy County Counsel, for Plaintiff and Respondent.

C.B. (father) appeals from the juvenile court's jurisdictional findings and disposition order. Father challenges the sufficiency of the evidence supporting the court's exercise of jurisdiction over his son under Welfare and Institutions Code[1] section 300, subdivisions (a), (b), and (j), and the order removing the child from father's custody. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.     Dependency referrals and petition

Father has two children—a son born in December 2010, and a daughter born in August 2006. The children's mother died by suicide in 2013.

The family first came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) in November 2020, based on a referral alleging that there was insufficient food in the family's home. The following month, in December 2020, DCFS received a second referral alleging that father had been out of work and the family was struggling to obtain food. The reporting party also disclosed that the then 14-year-old daughter required emergency follow-up care from an endocrinologist, neurologist, and psychiatrist. According to the reporting party, the daughter had been diagnosed with diabetes, extreme tremors, and depression, and had not been sleeping.

During DCFS's investigation of the referral, the children's social worker expressed concern to father about his daughter being depressed and requested that he enroll the child in therapy. Father failed to do so. The social worker also expressed

_____

[1] Unless otherwise stated, all further statutory references are to the Welfare and Institutions Code.

2

concern about father's own mental health. Father had told the social worker, "I take care of my kids. I talked to them last year about what's happening now. I was able to pre-warn them about COVID. I explained everything to them about what's happening now[,] and I told their teachers, family members, and my ex-girlfriend at the time. I said there is something going on in the air and with people's mental stability." Although father initially agreed to participate in an up front assessment, he later cancelled his appointment and failed to reschedule. As of February 2021, DCFS's investigation of the referral remained open.

On February 1, 2021, the daughter committed suicide by jumping from her third floor bedroom window. When officers responded to the scene, father refused to allow them inside the home or to speak to them without an attorney present. The officers observed that father showed no emotion regarding the death of his child, though he said it was because the death had not yet hit him. He denied his daughter suffered from a mental illness or had made any statements indicating she was depressed.

While executing a search warrant on the family's home, law enforcement found multiple pencil drawings on the daughter's bedroom wall. Some of the drawings depicted: (1) a grim reaper with the words "straight to hell"; (2) a figure in a long dress with the words "learning to dance with my depression"; (3) a girl swinging from a tree by the neck with the words "deadmen deadmen swinging in a tree how many deadmen do you see? Tongue turned blue face gone grey. Watch them as they twist and sway"; (4) wrists and hands with the words "I'm done"; and (5) lips and teeth with the words "everyone talks too much."

DCFS's Multi-Agency Response Team immediately began an investigation. On February 1, 2021, the children's social worker assigned to conduct the investigation interviewed father at the family's home. Father stated he did not notice anything out of the ordinary the day before his daughter's suicide. He also reported he had a good relationship with his daughter, and denied the child had ever said she wanted to hurt herself. When asked about the drawings found on the daughter's bedroom wall, father replied that he had no concerns about them because the family was artistic and his daughter liked to draw. When the social worker pointed out that the images were concerning, father minimized the drawings and said they were two years old. Father acknowledged the previous social worker had told him that his daughter was depressed and needed follow-up care with different medical professionals. He disclosed he never questioned his daughter about the social worker's concerns because he did not want to invade the child's privacy.

Father described his son as outgoing and outspoken. He initially stated he loved his son, and then said he loved both of his children equally. The social worker observed a difference in the way father spoke about his son compared to his daughter. When the social worker tried to set up a safety plan with father to have the son stay with a family member, father refused and stated the child needed to be in the home with him. The social worker noticed father exhibited a flat affect during his interview.

The social worker also conducted a private interview with the son. The child reported his sister had fallen or jumped out of her bedroom window. The son recounted he was in his own bedroom when he heard a loud thump. He went to his sister's bedroom, looked out the open window, and saw her on the

4

ground. After he told father, they put on their shoes and jackets and then went downstairs where father called the police. The son denied his sister ever told him that she wanted to hurt herself. According to the son, neither he nor his sister talked much to father because the family tended to remain in their respective bedrooms. Father and his daughter only spoke when father went to the market and asked her what she wanted. The son stated he felt safe in the family's home, and there was always enough food to eat. He denied having any suicidal thoughts or feeling sad. When asked if he felt sad about his sister's death, the son responded he was "a little sad," but would think about "happy memories."

The social worker subsequently interviewed a number of maternal and paternal family members. The maternal grandmother (MGM) reported that she had concerns about the children since November 2020. The children consistently complained they did not have food in the home, and acted as if they were starving when they visited her. After the son's school contacted the MGM because the child had missed two weeks of distance learning, father agreed that the son would go to MGM's home during the week and she would help him with his online schooling. The MGM also believed father had neglected the daughter's medical needs. Father took his daughter to the doctor in January 2020, but did not follow through on the doctor's order for lab work. In December 2020, the MGM took the daughter to the doctor to have the lab work completed and to a follow-up appointment regarding the results. The daughter's doctor had emergent concerns about her health because she was pre-diabetic, was allergic to dairy and required an inhaler, was experiencing tremors in her hands and short term memory loss,

and was suffering from depression.  The doctor referred the daughter to counseling as well as to a neurologist, endocrinologist, nutritionist, and psychiatrist.  The MGM reported that father never followed up with any of the child's medical appointments.

The MGM also believed father suffered from mental health issues.  The children had told her that father would lecture them for hours and jump from topic to topic without making any sense. The daughter had disclosed that father talked to himself in a manner that at times seemed aggressive, and he sometimes went to her bedroom while she was sleeping and would stand there and stare at her.  The daughter also had reported that father would accuse her of stealing household items that he had misplaced and would call her a liar when she denied his accusations.  Both children had said they were uncomfortable around father.

In his interview with the social worker, the maternal uncle expressed similar concerns about the children.  According to the maternal uncle, father was an entrepreneur who would spend money on materials for his clothing business rather than on necessities for the children.  The weekend before the daughter died, she visited the MGM's home and said there was no food in father's home.  The maternal uncle reported that father was verbally abusive toward the daughter, would accuse her of stealing things from the home, and would favor the son over the daughter.  The maternal uncle also believed father neglected the daughter's medical needs by failing to follow through on her doctor's appointments.  He noted that father did not take the daughter to a neurologist for the tremor in her hands.  Father

also failed to take the daughter to an optometrist for glasses, and instead said, "God would cure her eyes."

A paternal aunt who saw the daughter the weekend before her suicide did not observe any unusual behavior. The paternal aunt braided the daughter's hair that weekend, and the child seemed excited to have her hair done. While the paternal aunt did not have any concerns about father's care of the children, two paternal great-aunts shared a number of concerns. According to paternal great-aunt R.R., father had been distant from the family since 2019. R.R. had been told that father talked to himself. She also had heard the daughter was unhappy and did not want to live with father. R.R. noted that the paternal grandmother suffered from bipolar schizophrenia and would talk to herself when she was not taking medication. R.R. believed father needed psychiatric help, and she feared the son would attempt suicide in the future because of father. The paternal great-aunt, I.R., reported there were many signs that the daughter was suffering from depression, but father failed to address them. I.R. believed the son needed to be removed from the home to ensure his safety. She stated that if the son remained in the home, she foresaw the child attempting suicide and father not doing anything about it.

On February 8, 2021, DCFS filed a dependency petition on behalf of the son under section 300, subdivisions (b) and (j). In counts b-1 and j-1, the petition alleged that the son was at substantial risk of harm because father had medically neglected the daughter by failing to obtain a mental health evaluation for her or to follow through with her doctor's recommendations for medical care. In count b-2, the petition alleged that the son was also at substantial risk of harm because father had failed to provide the children with adequate food.

On February 11, 2021, the juvenile court detained the son from father. The court granted father monitored visitation with the child, and set the matter for an adjudication hearing. DCFS placed the son with the MGM.

## II.    Jurisdiction and disposition report

For its jurisdiction and disposition report, DCFS conducted further interviews with the family about the allegations in the petition. In his interview, father stated he was not comfortable discussing the allegations without his attorney present. He indicated he was upset with DCFS because he felt the agency had done nothing for him and his family. He also expressed his belief that DCFS had been negligent and should be held accountable because the agency "pushed his daughter to the edge." Father declined to make a statement regarding the allegations of medical neglect. He denied the allegations that he failed to provide the children with adequate amounts of food, and stated there was plenty of food in the family's home.

Father reported that he had a good relationship with his daughter, and had maintained open communication with her. According to father, the child never told him that she was sad or stressed. Instead, the daughter said she liked living with father and did not want to leave the home. Father noted that the daughter was very artistic, and that the drawings in her bedroom were two and a half years old. He did not believe the drawings indicated that the daughter was depressed or intended to hurt herself. Father stated that he believed the DCFS's involvement with the family had caused the daughter to take her own life. He further expressed that DCFS should be liable for the funeral expenses and the emotional distress he was experiencing.

In his interview, the son denied all forms of abuse. Although the son initially denied any feelings of sadness, he admitted he felt sad when he thought about his sister. He stated, however, that he tried not to focus on what happened the day his sister died and to instead focus on positive things such as school. The son indicated that he liked living with the MGM, and that he would like to live with both her and father. He also reported having a good relationship with father. With respect to the medical neglect allegations, the son initially expressed that he did not want to talk about his sister, and he became emotional during the interview. The child then said he did not interact much with father because everyone stayed in their own rooms, including during mealtimes. The son also said he had a better relationship with father than his sister had, and father did not talk much to his sister. With respect to the inadequate food allegations, the son reported that there was always food in the family's home. He noted that the MGM offered more food options than father, but he always had enough food to eat.

In her interview with DCFS, the MGM reiterated her concerns that father did not provide the children with adequate food, neglected the daughter's medical needs, and had mental health issues. According to the MGM, the daughter would spend the weekends at her home, and they would regularly communicate during the weekdays via telephone calls and text messages. The daughter had disclosed that she was not comfortable living with father, but she believed he would not allow her to move to the MGM's home. The daughter also had reported that she felt neglected by father because he rarely spoke to her. The daughter never expressed feelings of depression or thoughts of suicide to the MGM.

The MGM shared text messages she had received from the daughter. In one message, the daughter stated that she lived in an "awful toxic household," she was dealing with "a terrible father," and "[c]ertain things are blatantly wrong but nothing changes." She also expressed that there was neglect in the home, not enough food or water, and both mental and physical abuse. In a subsequent message, the daughter reported that she had not had anything to drink or eat, father had not spoken to her, and she sat in her room all day. In another message, the daughter stated she "was old enough to remember how [her] dad acted when he was normal," and she "had to watch [him] slowly spiral into this de[s]cent of madness."

The MGM last spoke with the daughter the weekend before her death. She also received a photo from the daughter showing that the child had just had her hair done. The MGM did not believe the daughter had planned to commit suicide, and suspected something had happened on the night of her death that made her feel there was no way out. The MGM reported that, since the daughter's death, the son had not shown any sadness or mentioned his sister. She believed the son would benefit from mental health services due to the trauma he had suffered in losing both his mother and his sister.

In his interview, the maternal uncle indicated that he was concerned about father's mental health. Prior to her death, the daughter disclosed that father displayed bizarre behavior and would lock himself in the bathroom and talk to himself for hours. The maternal uncle also expressed concern about the son's mental well-being. He believed the son would benefit from therapy because the child appeared to have a lot on his mind but did not talk about his sister.

In her interview with DCFS, paternal great-aunt R.R. stated she last saw the daughter in the summer of 2020, and the child did not seem happy. R.R. had minimal contact with the daughter in 2020 due to the COVID-19 pandemic, and when she attempted to reach out to father, he did not respond. R.R. had heard from a nephew that father "slapped the crap out of" the son, but she could not recall which nephew made that comment. She also had heard from another relative that the daughter had been looking for ways to kill herself.

DCFS spoke with a counselor at the son's school who reported that she had submitted a referral for mental health services for the child. The counselor explained that she had been checking in with the son twice a week, and that the child appeared nonchalant and not visibly affected by the recent events. The counselor was concerned the son was unable to verbalize his grief at that time.

In its report, DCFS expressed concern about father's mental health issues and his failure to enroll the daughter in therapy or to follow up with the child's medical appointments. DCFS also noted that father minimized the concerning drawings found in the daughter's bedroom, and blamed DCFS for the child's death despite the evidence that the daughter needed emotional support before the agency became involved with the family. DCFS recommended the juvenile court sustain the petition and assert jurisdiction over the son. DCFS did not make a recommendation as to family reunification services for father because law enforcement was continuing to investigate whether the daughter's death was a suicide or homicide.

## III.   First amended petition and last minute information

On March 2, 2021, DCFS filed a first amended dependency petition that added counts under section 300, subdivisions (a) and (b).  Count a-1 of the amended petition alleged that father physically abused the son on a prior occasion by grabbing the child's forearm and pinching his cheek.  Count b-3 alleged that father had unresolved mental health issues that inhibited his ability to provide regular care to the son.

In a last minute information report filed on March 3, 2021, DCFS stated that the MGM had reported that the son suffered possible physical abuse in father's care.  The MGM provided a photo showing a large mark and bruise on the son's forearm, and a second photo depicting a large scrape on the child's left cheek.  The son told the MGM that, in November 2020, father grabbed him by the arm and pinched him on the cheek.  When DCFS asked the son about the physical abuse allegations, the child initially stated he did not remember how he had sustained the injuries shown in the photos.  The son then disclosed that father pinched his forearm as he was lecturing the child about his behavior.  The son said he scraped his cheek when he fell one morning on his way to meet the MGM for school.

In a follow-up interview with DCFS, father denied the allegations in the amended petition.  He stated he did not physically discipline the children, and did not have any mental health issues.  Father reported that DCFS's intervention was the result of "someone disagreeing with [his] parenting style."  He also questioned why DCFS was raising new allegations so close to the adjudication hearing, and reiterated his belief that the agency was responsible for his daughter's suicide because the child died on "DCFS's watch."

In another last minute information report filed on April 1, 2021, DCFS indicated that law enforcement had concluded its investigation of the daughter's death, and no criminal charges would be filed against father. DCFS recommended the juvenile court maintain jurisdiction and father participate in a mental health evaluation. DCFS also recommended father's visits with his son remain monitored in an agency-approved setting.

## IV. Jurisdiction and disposition hearing

On April 15 and 27, 2021, the juvenile court held a combined jurisdiction and disposition hearing. The court admitted into evidence the reports filed by DCFS. Father's counsel called four witnesses to testify: (1) the MGM; (2) the maternal uncle; (3) the paternal great aunt, R.R.; and (4) the paternal great aunt, I.R.

The MGM testified that she last had a meal in father's home two years ago. When she saw the daughter the weekend before her death, the child seemed happy and did not express any suicidal thoughts. The MGM denied telling DCFS that father failed to follow up with the daughter's medical appointments; rather, the social worker told the MGM that father was not following up. The MGM was comfortable caring for the son if the child was removed from father's custody and would be supportive of reunification with father.

The maternal uncle testified that he never had any meals in father's home or checked his refrigerator for food. R.R. testified that the paternal grandmother had been hospitalized for a nervous breakdown and had been diagnosed with schizophrenia or bipolar disorder. When R.R. last saw the daughter, the child did not look happy. I.R. testified that the daughter was an introverted child, and that she did not know if the daughter had

been depressed. I.R. believed the son should be removed from father's home immediately after the daughter's death, but felt it was currently safe for the child to return to father's care.

After hearing the argument of counsel, the juvenile court sustained the first amended petition as pleaded. Turning to disposition, the juvenile court declared the son a dependent of the court under section 300, subdivisions (a), (b), and (j), and ordered the child removed from father's custody. The court ordered father to participate in an Evidence Code section 730 evaluation, mental health counseling, parenting education, and conjoint counseling with the son if recommended by the therapist. Father was granted monitored visitation a minimum of nine hours per week.

Father filed a timely appeal.

## DISCUSSION

On appeal, father challenges the sufficiency of the evidence supporting the juvenile court's findings and orders at the jurisdiction and disposition hearing. He specifically contends the evidence was insufficient to support each of the jurisdictional findings because DCFS failed to prove that any alleged conduct by father placed his son at substantial risk of harm at the time of the hearing. He also claims there was insufficient evidence to support the disposition order because DCFS failed to establish that his son would be at substantial risk of harm if returned to father's care, or that removal was the only reasonable means of protecting the child from such risk.

## I.    Applicable law and standard of review

"At the first stage of dependency proceedings, the juvenile court determines whether the child is subject to juvenile court

14

jurisdiction; DCFS has the burden to prove jurisdiction by a preponderance of the evidence.  [Citation.]  At the second stage, the juvenile court must decide where the child will live while under juvenile court supervision; to support removal from parental custody, DCFS has the burden to prove by clear and convincing evidence that there is a risk of substantial harm to the child if returned home and the lack of reasonable means short of removal to protect the child's safety."  (*In re Yolanda L.* (2017) 7 Cal.App.5th 987, 992.)

We review challenges to the sufficiency of the evidence underlying jurisdictional findings and disposition orders for substantial evidence.  (*In re I.J.* (2013) 56 Cal.4th 766, 773.) " ' "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.]  "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court." ' " (*Ibid.*)  "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable factfinder could have found it highly probable that the fact was true."  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.)  "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or orders."  (*In re E.E.* (2020) 49 Cal.App.5th 195, 206.)

## II. Substantial evidence supported the jurisdictional finding under section 300, subdivision (j).

The juvenile court sustained count j-1 in the first amended petition as follows: "The child['s] . . . father . . . medically neglected the child's now deceased sibling . . . . The child's sibling demonstrated mental and emotional problems including depression, and on or about January 2020, the sibling was referred for a psychiatric evaluation, due to the child's mental and emotional problems. The father failed to obtain a mental health evaluation for the sibling. Further, on or about January 2020, the sibling's primary doctor ordered lab work for the sibling and the father failed to ensure that the sibling obtained the necessary lab work. The sibling's primary doctor expressed concerns in regards to the child being pre-diabetic, the tremors in the sibling's hands and the sibling's short term memory loss, allergy to milk, and the use of an inhaler. The sibling was referred to counseling, a neurologist, an endocrinologist, and a nutritionist and the father failed to follow through with the sibling's primary doctor's medical recommendations. The medical neglect of the child's sibling . . . by the father, endangers the child a[nd] places the child at risk of serious physical harm, damage, danger, and neglect."

Section 300, subdivision (j) provides that a child comes within the jurisdiction of the juvenile court if the "child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions." A jurisdictional finding under "section 300, subdivision (j) has two elements: first, that the [child's] sibling has been abused or neglected, and second, that there is a substantial risk that the

16

[child] will be abused or neglected." (*In re Ashley B.* (2011) 202 Cal.App.4th 968, 981.) In determining whether there is a substantial risk to the child, the juvenile court must "consider the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative." (§ 300, subd. (j).)

As our Supreme Court has explained, section 300, subdivision (j) " 'was intended to expand the grounds for the exercise of jurisdiction as to children whose sibling has been abused or neglected as defined in section 300, subdivision (a), (b), (d), (e), or (i).' " (*In re I.J.*, *supra*, 56 Cal.4th at p. 774.) " 'The broad language of subdivision (j) clearly indicates that the trial court is to consider the totality of the circumstances of the child and his or her sibling in determining whether the child is at substantial risk of harm. . . . The provision thus accords the trial court greater latitude to exercise jurisdiction as to a child whose sibling has been found to have been abused than the court would have in the absence of that circumstance.' " (*Ibid.*)

In assessing the risk of harm posed to a child, it also is necessary to recognize that " '[s]ome risks may be substantial even if they carry a low degree of probability because the magnitude of the harm is potentially great.' " (*In re I.J.*, *supra*, 56 Cal.4th at p. 778.) Accordingly, "[t]he more severe the type of sibling abuse, the lower the required probability of the child's experiencing such abuse to conclude the child is at a substantial risk of abuse or neglect under section 300." (*Ibid.*; accord, *In re D.B.* (2018) 26 Cal.App.5th 320, 328.)

In this case, we conclude there was substantial evidence supporting the juvenile court's exercise of jurisdiction under

17

section 300, subdivision (j) because father's failure to address the daughter's significant medical needs placed the son at substantial risk of suffering neglect or abuse in father's care.  On appeal, father does not dispute that he neglected his daughter within the meaning of section 300, subdivision (b).[2]  Indeed, father acknowledges that he "neglected his duties to [his daughter] by failing to seek help for her depression and by failing to follow up with doctor's appointments to address her medical needs."  Rather, father argues that his son was not at substantial risk of neglect or abuse because there was "no evidence [the son] suffered from depression or any other psychological or physical ailment," and thus, "no evidence [the son] had any similar needs that required addressing."  Father's argument lacks merit.

There was ample evidence to support the juvenile court's finding that the son was at substantial risk of abuse or neglect at the time of the jurisdiction and disposition hearing.  During the course of the dependency proceedings, multiple family members shared concerns about the son's mental health following the death of his sister.  The maternal uncle told DCFS that the son appeared "to have a lot on his mind," but the child did not talk about his sister's death or about her at all.  The MGM similarly related that the son had suffered traumatic experiences in losing

---

[2] Section 300, subdivision (b)(1) provides, in relevant part, that a child comes within the jurisdiction of the juvenile court if the "child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of child's parent or guardian to adequately supervise or protect the child, . . . or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment."

both his mother and his sister to suicide; however, the child did not mention his sister or share his feelings about the tragic events that had taken place. As a result, both the maternal uncle and grandmother believed the child would benefit from therapy. Two paternal great-aunts, R.R. and I.R., also expressed concern about the son's mental health, and told DCFS that they feared the child might attempt suicide in the future if left in father's care. Additionally, the school counselor reported that she had requested mental health services for the son because she had observed him to be nonchalant about his sister's death, and she was concerned that he was not verbalizing his grief. Thus, contrary to father's claim that his son was not suffering from depression or any other emotional problems, the record contains substantial evidence that the child was struggling with mental health issues that needed to be addressed.

The record also reflects that, throughout the dependency proceedings, father showed a persistent lack of insight into the mental health issues suffered by his daughter, and an unwillingness to recognize how his conduct contributed to the child's depression and failure to receive necessary medical care. When DCFS first became involved with the family, the social worker expressed her concern to father that the daughter was depressed, and she requested that he enroll the child in therapy. Father failed to do so, and he later revealed that he did not speak to the child about the social worker's concerns because he "never wanted to invade his daughter's privacy." Following his daughter's suicide, father continued to minimize the warning signs that preceded her death, asserting that he had no concerns about the drawings on his daughter's bedroom wall depicting

19

depression and death because the child was artistic, and the drawings were not recent.

Moreover, rather than accept any responsibility for his neglect of his daughter's substantial medical needs, father repeatedly tried to shift blame to DCFS. He claimed in his interviews that DCFS should be held accountable for the child's suicide because the agency had "pushed his daughter to the edge," and she had died on "DCFS's watch." The evidence showed, however, that the daughter's mental health issues existed before DCFS's involvement with the family, and the child had expressed to her maternal relatives that she felt neglected and unloved by father. While the son reported having a better relationship with father than his sister had, he admitted that father rarely interacted with either sibling, and they spent most of their time alone in their respective bedrooms. Given father's conduct in failing to recognize and address the daughter's serious mental health issues and need for treatment, the juvenile court reasonably could infer that the son's mental health needs would likewise be neglected.

Considering the totality of the record, the juvenile court reasonably could conclude that the son was at substantial risk of suffering neglect or abuse in father's care, and that jurisdiction over the child was necessary to protect him from such risk of harm. The juvenile court's finding that the son came within the jurisdiction of the court under section 300, subdivision (j) was therefore supported by substantial evidence.[3]

_____

[3] " 'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile

20

## III. Substantial evidence supported the order removing the son from father's custody.

" 'At the dispositional hearing, a dependent child may not be taken from the physical custody of the parent under section 361 unless the court finds there is clear and convincing evidence there is or would be a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being if returned home, and that there are no reasonable means to protect the child's physical health without removing the child.' " (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1065; see § 361, subd. (c)(1).) The court must determine "whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home" and "shall state the facts on which the decision to remove the minor is based." (§ 361, subd. (e).)

"In determining whether a child may be safely maintained in the parent's physical custody, the juvenile court may consider the parent's past conduct and current circumstances, and the parent's response to the conditions that gave rise to juvenile court intervention." (*In re D.B.*, *supra*, 26 Cal.App.5th at p. 332.) "A removal order is proper if it is based on proof of (1) parental

---

court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' " (*In re I.J.*, *supra*, 56 Cal.4th at p. 773.) In this case, because there was substantial evidence supporting the juvenile court's exercise of jurisdiction under section 300, subdivision (j), we need not consider whether jurisdiction was also proper under subdivisions (a) or (b).

inability to provide proper care for the minor and (2) potential detriment to the minor if he or she remains with the parent. [Citation.] The parent need not be dangerous and the minor need not have been harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*In re T.W.* (2013) 214 Cal.App.4th 1154, 1163; accord, *In re D.B.*, at p. 328.)

In this case, the same evidence that supported the juvenile court's jurisdictional finding under section 300, subdivision (j) also supported its removal order. (§ 361, subd. (c)(1); see *In re D.B., supra*, 26 Cal.App.5th at p. 332 [" 'jurisdictional findings are prima facie evidence the minor cannot safely remain in the home' "].) As discussed, father neglected his daughter's mental health because he prioritized his desire to respect the child's privacy over her urgent need for psychological care. Following his daughter's suicide, father continued to rationalize and minimize the signs that she may have been suffering from severe depression and suicidal ideation, and he repeatedly claimed DCFS was solely responsible for the child's tragic death. There was no indication that, as of the jurisdiction and disposition hearing, father had gained any insight into his conduct and the substantial risk of harm that it posed to his surviving child.

In challenging the juvenile court's removal order, father asserts there were less drastic alternatives to removal such as returning his son to his custody "under stringent conditions of supervision by the agency." (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 148.) Father reasons that his son had already been referred for counseling, and that the services ordered for father could have been pursued without removing the child from his care. However, prior to the daughter's death, father had not been receptive to services from DCFS. He also

maintained throughout the proceedings that DCFS's intervention was the result of a disagreement with his parenting style rather than any neglectful conduct on his part.  On this record, the juvenile court reasonably could conclude that father's medical neglect of his daughter presented a substantial risk of harm to his son, and such risk could only be obviated by removing the child from father's custody.  The removal order was supported by substantial evidence.

## DISPOSITION

The order is affirmed.
NOT TO BE PUBLISHED.


VIRAMONTES, J.[*]


We concur:


LAVIN, Acting P. J.


EGERTON, J.

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.